# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| *versus* | : | CRIMINAL NO. 19-61-SDD-EWD |
| | : | |
| EHAB MESELHE and | : | |
| KELIN HU | : | |

## UNITED STATES' RESPONSE TO
## DEFENDANTS' MOTION TO DISMISS THE INDICTMENT

**MAY IT PLEASE THE COURT:**

COMES NOW the United States of America, by Brandon J. Fremin, United States Attorney for the Middle District of Louisiana, through the undersigned Assistant United States Attorneys, and respectfully submits this Response to the Motion to Dismiss the Indictment (D.E. 24), filed by Ehab Meselhe and adopted by Kelin Hu (D.E. 26, 42). The defendants argue that the Basin Wide Model ("BWM") is public property owned solely by the State of Louisiana; therefore, it cannot be a trade secret of the Water Institute of the Gulf ("TWIG") nor can the unauthorized access thereof, via the protected computers of TWIG, constitute computer fraud and abuse. As more fully explained in this response, the motion lacks merit and should be denied in its entirety, for the following reasons: (1) the Indictment clearly charges Meselhe and Hu with conspiracy and attempt to steal trade secrets, namely the BWM, in violation of 18 U.S.C. § 1832, and any questions of fact surrounding the nature of the alleged trade secret are reserved for the jury to determine at trial; (2) the Indictment clearly charges Meselhe and Hu with violations of 18 U.S.C. § 1030, including conspiracy to

exceed authorized access to TWIG's protected computers and thereby obtain the BWM;[1] and (3) the relevant charging statutes provide sufficient notice of prohibited conduct such that neither is void for vagueness.

## I.    Facts Alleged in the Indictment

A federal grand jury has charged Defendants Ehab Meselhe and Kelin Hu with conspiracy to steal trade secrets, in violation of 18 U.S.C. § 1832(a)(5) (Count One); attempting to steal trade secrets, in violation of 18 U.S.C. § 1832(a)(4) (Count Two); and conspiracy to commit computer fraud and abuse, in violation of 18 U.S.C. § 1030(b) (Count Three). In addition, Defendant Hu has been charged with committing computer fraud and abuse, in violation of 18 U.S.C. § 1030(a)(2)(C) (Count Four).[2] The charges are based on the following factual allegations set forth in the Indictment.

TWIG is an applied research institution in Baton Rouge, Louisiana, which studies various coastal threats and means of mitigating their negative impact on coastal communities and the natural environment. *Indictment*, ¶ 3. TWIG uses sophisticated computer programs and models, real-time forecasting methods, and other scientific tools to assist public and private entities in formulating water management, coastal preservation and reclamation, and water threat abatement strategies. *Indictment*, ¶ 4. Of special importance to TWIG is a hydrosimulation computer program called the BWM, which TWIG developed over many years and at significant cost, and which contains unique computer inputs, codes, files, and

---

[1] Count Four of the Indictment charges only Hu with committing computer fraud and abuse, in violation of 18 U.S.C. § 1030(a)(2)(C); therefore, Count Four was not challenged in Meselhe's motion nor has Hu moved to dismiss Count Four.

[2] As recognized at n.1, *supra*, Hu has not moved for dismissal of Count Four of the Indictment.

post-processing scripts used to run the BWM. *Indictment*, ¶ 5. The BWM is a highly sensitive, proprietary, and valuable trade secret of TWIG due to its ability to project how the natural environment of the Mississippi Delta will change over time, and its protection as a trade secret is essential to maintaining TWIG's competitiveness for consulting contracts worth millions of dollars. *Indictment*, ¶ 6.

One such contract was between TWIG and the Environmental Defense Fund ("EDF"). If a competitor copied TWIG's computer files showing how the BWM worked in relation to the EDF project, TWIG would lose its trade secret and therefore its competitive edge to win other contracts in the future. *Indictment*, ¶ 7.

At times relevant to the Indictment, Meselhe and Hu both worked at TWIG before leaving to join another water research institution in Louisiana which, like TWIG, engaged in paid environmental consulting work. *Indictment*, ¶ 9. Upon joining TWIG, Meselhe and Hu each signed a Proprietary Information and Intellectual Property Agreement, acknowledging that computer programs like the BWM were valuable trade secrets of TWIG and that they were not to be shared with outside individuals, entities or competitors. *Indictment*, ¶ 8. Until his departure from TWIG on October 31, 2018, Meselhe was an environmental scientist and civil engineer working with scientists knowledgeable in computer programming. *Indictment*, ¶¶ 1, 9. Likewise, until January 11, 2019, Hu was a computer scientist with expertise in computer programming and modeling and with access to underlying software codes. *Indictment*, ¶¶ 2, 9.

From October 2018 through January 11, 2019, Meselhe and Hu, conspired to steal and otherwise misappropriate the BWM and to use the BWM for the economic benefit of

3

Meselhe, Hu, and the other water research institution, and to the detriment of TWIG.
*Indictment*, ¶¶ 11, 12, 27, 29. In furtherance thereof, Meselhe and Hu sought to obtain copies
of the BWM and related computer inputs, codes, files and post-processing scripts, as
contained in TWIG's computer files on the EDF project. *Indictment*, ¶¶ 13, 14, 27, 29.
Likewise, from October 2018 through January 11, 2019, Meselhe and Hu, conspired to
exceed authorized access to TWIG's protected computers to obtain information therefrom,
namely, the BWM. *Indictment*, ¶¶ 30, 31.

On November 12, 2018, while a professor at the other water research institution,
Meselhe communicated to Hu via Google Message that he had secured an appointment for
Hu to join him on staff there, beginning in January 2019. *Indictment*, ¶ 19. On November 21,
2018, via Google Message, Meselhe instructed Hu to "[a]void sending me any private
emails" from Hu's TWIG account because "they are monitoring everything," and to "[t]ext
me or email me from your gmail or yahoo accounts…." *Indictment*, ¶ 20. That same day, Hu
responded: "Got that! Thanks." *Indictment*, ¶ 21. On December 11, 2018, via Google
Message, Meselhe instructed Hu to "make a full copy of the entire EDF project folder to an
external hard drive BEFORE you resign" from TWIG and to "include the code itself, the post
processing scripts and everything also." *Indictment*, ¶ 22. That same day, Hu responded:
"Yes, I will do those." *Indictment*, ¶ 23. Two days later, on December 13, 2018, Meselhe
emailed Hu a "suggested plan," advising that Hu should quit TWIG on January 16, 2019, in
order to start work at the other water research institution on February 1, 2019, and reiterating
that Hu should finish the EDF project and "back up everything before you leave or even
before you submit you resignation." *Indictment*, ¶ 24. That same day, Hu responded: "I'm

totally fine with the plan." *Indictment*, ¶ 25. On January 11, 2019, Hu was caught in the act of downloading the complete EDF file, including the BWM and related computer inputs, codes, files, and post-processing scripts, to personal computer devices. *Indictment*, ¶ 26. As a result, Hu was fired and escorted from TWIG's premises. *Id*.

## II.    <u>Applicable Standards</u>

### A.  **Sufficiency of the Indictment**

Federal Rule of Criminal Procedure 7 sets forth the requirements for a federal criminal indictment. Pursuant thereto, "[t]he indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Threadgill*, 172 F.3d 357, 373 (5th Cir. 1999). "[A] valid indictment must set forth the alleged offense 'with sufficient clarity and certainty to apprise the accused of the crime with which he is charged.'" *United States v. Dentler*, 492 F.3d 306, 309 (5th Cir. 2007) (quoting *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004)).

Federal Rule of Criminal Procedure 12(b) allows a criminal defendant to file a pretrial motion asserting that an indictment is defective because of, *inter alia*, "failure to state an offense[,]" "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits[.]" Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v); *see also United States v. Korn*, 557 F.2d 1089, 1090 (5th Cir. 1977) ("'[T]he propriety of granting a

motion to dismiss an indictment under [Rule] 12 by pretrial motion is by-and-large contingent upon whether the [alleged] infirmity in the prosecution is essentially one of law or involves determinations of fact.'") (quoting *United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974)).

"The test is not whether the indictment might have been drawn with greater certainty and exactitude, but rather whether it set forth the elements of the offense charged and sufficiently apprized the defendant of the charges to prepare for." *United States v. Markham*, 537 F.2d 187, 193 (5th Cir. 1976) (citing *United States v. Debrow*, 346 U.S. 374, 378 (1953)); *see also Threadgill*, 172 F.3d at 373 ("The test for the validity of an indictment is . . . whether it conforms to minimal constitutional standards.'") (quoting *United States v. Webb*, 747 F.2d 278, 284 (5th Cir. 1984)). "The Constitution requires only enough specificity to allow the defendant to defend against the allegations[.]" *United States v. Pratt*, 728 F.3d 463, 478 (5th Cir. 2013), *abrogated on other grounds by Molina–Martinez v. United States*, ––– U.S. –––, 136 S. Ct. 1338, 1347–48 (2016).

When analyzing "the sufficiency of the indictment, [courts] are required to 'take the allegations of the indictment as true and to determine whether an offense has been stated.'" *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998)). Although an indictment "'must allege that the defendant committed each of the essential elements of the crime charged . . . , [i]t is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges.'" *United States v. Caldwell*, 302 F.3d 399, 411–12 (5th Cir. 2002) (quoting *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978)); *see also Pratt*, 728

F.3d at 478 ("[T]he indictment need not . . . articulate the evidence that will be used to prove the allegations."). The validity of an indictment is determined from reading the indictment as a whole and must be determined by practical, not technical, considerations. *See Markham*, 537 F.2d at 192.

### B.  Void for Vagueness Doctrine

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

### III.    Defendant's Argument

In an effort to circumvent the foregoing standards, Defendants claim that the Indictment fails to state an offense under 18 U.S.C. § 1832, arguing that the BWM is public property of the State of Louisiana and therefore, "as a matter of law," TWIG cannot own the BWM and it cannot be a trade secret.[3] Yet, the defendants fail to cite any law in support of

---

[3] Defendants ask the Court to take "judicial notice" of the exhibits attached to the motion, which include the Cooperative Endeavor Agreement ("CEA") between Coastal Protection and Restoration Authority of the State of Louisiana ("CPRA") and TWIG, as well as certain Task Orders issued in connection therewith. See D.E. 24-1 n.2. Federal Rule of Evidence 201(b) allows for judicial notice of "a fact that is not subject to reasonable dispute . . . ." That said, "[a] high degree of indisputability is the essential prerequisite." Fed. R. Evid. 201 advisory committee's note (1972). Moreover, at trial "[i]n a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive." Fed. R. Evid. 201(g). Here, Defendants fail to clearly articulate their intended purpose in requesting judicial notice of the attachments. These documents do not provide a basis for Defendants' unsupported legal conclusions that TWIG "cannot" own the BWM and the BWM "cannot" be a trade secret. Thus, to the extent Defendants attempt to rely on the documents for those propositions, the rules do not allow for judicial notice thereof.

7

these sweeping and baseless legal conclusions.[4] As explained herein, 18 U.S.C. § 1839(4) contemplates more than one statutory "owner." Thus, merely establishing the State of Louisiana as the outright owner of the BWM is not fatal to the offenses charged in the Indictment. In reality, the hybrid nature of the BWM, its development, and the extent to which it is used to establish TWIG's competitiveness for consulting contracts renders this a much more nuanced issue, subsumed in the jury's ultimate fact inquiry into the nature of the BWM as a trade secret. Moreover, the alleged "public" nature of the BWM and any resultant, claimed ability to access the BWM through proper channels is likewise not dispositive or even relevant. The Fifth Circuit has acknowledged that "the 'theoretical ability of others to ascertain the information through proper means does not necessarily preclude protection as a trade secret [and] the trade secret owner retains protection against an improper acquisition, disclosure, or use.'" *Wen Chyu Liu*, 716 F.3d at 170 n.28 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION §§ 39, 43 (1995)).

In further reliance on the alleged "public" nature of the BWM, Defendants likewise allege that the Indictment fails to state an offense under 18 U.S.C. § 1030, arguing that they cannot, "as a matter of law," have "exceeded authorized access" or achieved any commercial advantage or private financial gain by obtaining the BWM. As explained below, and in accordance with Fifth Circuit precedent, the Indictment sufficiently alleges that Meselhe and Hu exceeded authorized access to TWIG's protected computers to obtain the BWM, and that

---

[4] The fact of public funding is not dispositive of whether or not a trade secret may exist. The public-private aspects of the BWM's creation may be analogized to how military technology is funded and developed using public funds and still subject to trade secret protections. *See, e.g., United States v. Sparks*, No. 3:16-cr-198-AWT (D. Conn.) (electrical engineer convicted under § 1832 for misappropriating trade secrets on U.S. Navy-funded project to develop underwater drones).

8

they did so for commercial advantage or private financial gain and in furtherance of the theft of a trade secret.

**IV.** **Argument**

"The starting place for any determination of whether the charged conduct [is] proscribed by [a criminal] statute is a reading of the language of the charging instrument and the statute itself." *United States v. White*, 258 F.3d 374, 381 (5th Cir. 2001) (quoting *United States v. Morales–Rosales*, 838 F.2d 1359, 1361 (5th Cir. 1988)). In this case, each count in the Indictment tracks the language of the statute itself, clearly alleges the elements of the offense charged, and includes sufficient and clear factual details to put the defendants on notice of the crime of which they have been accused. In fact, the Indictment significantly exceeds the minimum pleading requirements to provide a thoroughly detailed factual basis in support of each element of the charged offenses. Furthermore, each of the charged statutes sufficiently defines the conduct prohibited thereunder and the appropriate standards for enforcement thereof.

**A. Counts One and Two: The Economic Espionage Act**

The Economic Espionage Act of 1996 ("EEA"), as amended in 2012 and codified in 18 U.S.C. § 1832, provides, in pertinent part:

(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly--

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> . . .
>
> (4) attempts to commit any offense described in paragraphs (1) through (3); or
>
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall . . . be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1832(a)(1), (2), (4), and (5).

"[T]he purpose of the EEA was to provide a comprehensive tool for law enforcement personnel to use to fight theft of trade secrets." *United States v. Yang*, 281 F.3d 534, 543 (6th Cir. 2002). As such, the EEA broadly defines the term "trade secret" to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The secrecy "need not be absolute;" rather, the required secrecy is that which is "sufficient to confer an actual or potential economic advantage on one who

10

possesses the information" and "is satisfied if it would be difficult or costly for others who could exploit the information to acquire it without resort to [] wrongful conduct[.]" RESTATEMENT § 39 cmt. e (1995); *see also Reingold v. Swiftships, Inc.*, 126 F.3d 645, 650 (5th Cir. 1997).[5]

Here, Defendants sought to obtain the current and most proprietary version of the BWM, which is physically located at TWIG, has never been anywhere else, and has been protected by TWIG as a trade secret. Generally, the BWM contains four components that represent coastal Louisiana: hydrodynamics, morphodynamics, nutrient dynamics and vegetation dynamics. TWIG has significantly modified these components since the BWM's initial creation by TWIG and its subcontractors, and the current and most proprietary version of the BWM will be referred to as "Version 3." The components in Version 3 have undergone new parameterization related to riverine sediment transport and an extensive calibration and validation exercise, including the use of data and updates to the numerical grid, which is a key component of the BWM. Importantly, Version 3 is the only version of the BWM that has been approved for modeling the Environmental Impact Statements ("EIS") for the Mid-Barataria and Mid-Breton Sediment Diversions, at the heart of the EDF project. Version 3 of the BWM, including the pre-processing (how the inputs to the model are prepared) and post-processing (how the outputs are read) scripts, as well as the scripts used to couple the four main components of the BWM, are treated as highly proprietary,

---

[5] Further, "confidential disclosures to employees, licensees, or others will not destroy the information's status as a trade secret. Even limited non-confidential disclosure will not necessarily terminate protection if the recipients of the disclosure maintain the secrecy of the information." RESTATEMENT, § 39 cmt. e.

valuable trade secrets by TWIG. The coupling of the components is used for the 50-year EIS runs, for each of the 10 year cycles and to generate the next 10 year cycle. It is this body of scripts, applications and production runs, which is not generally known outside of TWIG and therefore constitutes the most valuable, proprietary version of the BWM.

Contrary to Defendants' claims, "a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994); *see also Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc*., 920 F.2d 171, 174 (2d Cir. 1990). While "trade secret protection is necessarily limited by the public and private interest in access to valuable information[,]" the freedom to copy the methods, processes, and ideas of others "does not extend to information that is inaccessible by proper means." RESTATEMENT § 39 cmt. a. Thus, the very fact of Defendants' alleged theft, and the resultant implied inability to access the BWM by proper means, undercuts any claim that the BWM, in its current and most proprietary form, is generally known or readily ascertainable outside of TWIG.

Significantly, for purposes of the instant motion, "[t]he existence of a trade secret is properly considered a question of **fact** to be decided by the judge or jury as fact-finder." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (citation omitted) (emphasis added). And, as explained herein, the law does not require that the Government *prove* the existence of an actual trade secret in order to meet its ultimate evidentiary burden on Counts One and Two.

The EEA likewise defines "the term 'owner', with respect to a trade secret, [to] mean[] the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed[.]" 18 U.S.C. § 1839(4). A licensee is a person or entity that has been granted legal permission by another party to conduct some sort of business over which the other party holds some control, ownership, or authority. Thus, the statute itself contemplates that there may be more than one "owner" of a particular trade secret. Here, pursuant to the CEA and Task Orders, CPRA tasked TWIG with developing the BWM and granted TWIG legal permission to possess it, run it, and issue reports based on its findings. At present, TWIG remains in possession of and continues to use the BWM.

"Courts confronting the question of whether possession or ownership is required in a trade secrets misappropriation claim have rejected the argument that traditional ownership is required to prevail." *Fast Capital Mktg., LLC v. Fast Capital LLC*, No. H-08-2142, 2008 WL 5381309, at *12 (S.D. Tex. Dec. 24, 2008) (collecting cases). As the Fourth Circuit has explained:

> [T]he inherent nature of a trade secret limits the usefulness of an analogy to property. . . The "proprietary aspect" of a trade secret flows, not from the knowledge itself, but from its secrecy. It is the secret aspect of the knowledge that provides value to the person having the knowledge. . . . While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. As a consequence, one "owns" a trade secret when one knows of it, as long as it remains a secret.

*DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) (involving claims for misappropriation of trade secrets under the uniform act as adopted in Maryland). Moreover, civil cases recognize that these distinctions stem from the fact that

13

"misappropriation of a trade secret is not only an intrusion on property, *it is also a breach of confidence*." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 320 (M.D. Pa. 2014) (quoting *Metso Minerals Industries, Inc. v. FLSmidth–Excel LLC*, 733 F. Supp. 2d 969 (E.D. Wis. 2010) (emphasis in original)). In this criminal case, the so-called "breach of confidence" speaks to the defendants' intent and knowledge in stealing the BWM to the injury of TWIG and to the economic benefit of themselves and the other water research institution.

Tracking the statutory language in 18 U.S.C. § 1832, Counts One and Two clearly charge Meselhe and Hu with the inchoate crimes of conspiracy and attempt to steal trade secrets. Moreover, the Indictment charges each required element of the substantive offense of theft of trade secrets. This legal distinction becomes relevant in terms of the proof required at trial; however, at this stage in the proceedings, the Indictment need only set forth the alleged offenses with sufficient clarity and certainty to apprise the accused of the crimes with which they are charged. *Dentler*, 492 F.3d at 309. Although the indictment need not articulate the evidence that will be used to prove the allegations, *Pratt*, 728 F.3d at 478, understanding the United States' ultimate burden of proof on the charged offenses further emphasizes the shortcomings in the motion to dismiss.

It is well-established that proof of a conspiracy to commit a violation of Section 1832 does not require the Government to *prove* the existence of trade secrets at trial, only that the defendant *believed* that trade secrets would be misappropriated. "With respect to the substantive offense of theft of trade secrets, the Government must prove (1) that the defendant intended to convert proprietary information to the economic benefit of anyone

other than the owner; (2) that the proprietary information was a trade secret; (3) that the defendant knowingly stole, copied, or received trade secret information; (4) that the defendant intended or knew the offense would injure the owner of the trade secret; and (5) that the trade secret was included in a product that is placed in interstate commerce." *United States v. Wen Chyu Liu*, 716 F.3d 159, 169–70 (5th Cir. 2013) (citing 18 U.S.C. § 1832). However, "the relevant inquiry in a conspiracy case, such as this one, is whether the defendant entered into an agreement to steal, copy, or receive information that he *believed* to be a trade secret—that is, did the defendant believe that the information he conspired to obtain was proprietary and was being taken for the economic benefit of someone other than the owner?" *Wen Chyu Liu*, 716 F.3d at 170 (emphasis in original) (citing *United States v. Yang*, 281 F.3d 534, 544 (6th Cir. 2002); *United States v. Martin*, 228 F.3d 1, 11–13 (1st Cir. 2000); and *United States v. Hsu*, 155 F.3d 189, 198 (3d Cir. 1998)). Likewise, to prove attempt, as charged in Count Two, the Government must establish that the defendants (1) had the intent to commit a crime defined by the Economic Espionage Act of 1996, and (2) performed an act amounting to a "substantial step" toward the commission of that crime. *Hsu*, 155 F.3d at 202. "[T]he [G]overnment need not prove that an actual trade secret was used . . . because a defendant's culpability for a charge of attempt depends only on 'the circumstances as he believes them to be,' not as they really are." *Id.* at 203.

In sum, the Indictment sufficiently alleges violations of the EEA, and Defendants' arguments to the contrary lack merit. As explained, the defining features of a trade secret protected by the EEA are that it is commercial and that it is secret, not who or what funded its origination or development. *See* 18 U.S.C. §§ 1839(3)(A) and (B); *see also* footnote 4,

15

*supra*. Here, a public agency placed funding in private hands to develop the commercially viable and proprietary BWM, which is not an instrument of governance but a business asset that happens to serve public ends. The Indictment clearly charges Defendants with unlawfully conspiring and attempting to steal the BWM, such that the motion to dismiss Counts One and Two should be denied.

### B. Count Three: The Computer Fraud and Abuse Act

Title 18, United States Code, Section 1030, titled "Fraud and related activity in connection with computers," was originally enacted as the Computer Fraud and Abuse Act of 1986 ("CFAA") and provides, in pertinent part:

(a) Whoever—

   (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

      (C) information from any protected computer;

. . . shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(2)(C). As relevant to Count Three of the Indictment, section 1030(b) prohibits conspiracy to commit an offense under subsection (a), subject to the same punishments. 18 U.S.C. § 1030(b). Section 1030(c)(2)(B) provides:

 (c) The punishment for an offense under subsection (a) or (b) of this section is--

   (B) a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if—

      (i) the offense was committed for purposes of commercial advantage or private financial gain;

16

(ii) the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

(iii) the value of the information obtained exceeds $5,000[.]

18 U.S.C. §§ 1030(c)(2)(B)(i)–(iii).

The CFAA also defines certain relevant terms, as follows. A "protected computer" means, in pertinent part, a computer "which is used in or affecting interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]" 18 U.S.C. § 1030(e)(6).

In the motion to dismiss, Defendants argue, without citing any law, that "there can be no crime of 'exceeding authorized access' where a computer user is simply accessing public information." (D.E. 24-1, p. 8). Perhaps this would be a colorable argument if, on January 11, 2019, Meselhe and Hu were mere "computer users," at a kiosk stationed in the public library, "simply accessing public information." To the contrary, Meselhe was a former employee, then-employed by a potential competitor of TWIG with whom he had also secured future employment for Hu, instructing then-nominal employee Hu to use his physical access to TWIG's protected computer to obtain proprietary information for the purpose of commercial advantage and private financial gain and in furtherance of a theft of the valuable trade secret known as the BWM.

In *United States v. John*, the Fifth Circuit was faced with a challenge to, *inter alia*, the sufficiency of the evidence in support of convictions under 18 U.S.C. § 1030(a)(2)(A) and

17

(C). *United States v. John*, 597 F.3d 263, 270–73 (5th Cir. 2010). Recognizing that the

CFAA does not define "authorized" or "authorization," *John* addressed the following

question: "whether 'authorized access' or 'authorization' may encompass limits placed on

*the use* of information obtained by permitted access to a computer system and data available

on that system." *John*, 597 F.3d at 271 (emphasis in original). Answering in the affirmative,

the Fifth Circuit explained that "[a]n employee would 'exceed[ ] authorized access' if he or

she used that access to obtain or steal information as part of a criminal scheme." *Id*. Here, the

Indictment alleges precisely that.

Further, the Indictment alleges that both Meselhe and Hu signed a Proprietary

Information and Intellectual Property Agreement, acknowledging that proprietary

information like the BWM were valuable trade secrets of TWIG and that they were not to be

shared with outside individuals, entities or competitors. *Indictment*, ¶ 8. These signed

agreements, coupled with other evidence to be presented at trial, establish the parameters of

any "authorized" access. In the Fifth Circuit, violating a confidentiality agreement, alone,

may not give rise to criminal culpability; however, "the concept of 'exceeds authorized

access' may include exceeding the purposes for which access is 'authorized.'" *John*, 597

F.3d at 272 (citing *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 578–79 (1st Cir.

2001)). "Access to a computer and data that can be obtained from that access may be

exceeded if the purposes for which access has been given are exceeded." *John*, 597 F.3d at

272.[6] The Indictment clearly charges Meselhe and Hu with conspiring to exceed authorized

---

[6] *John* "recognize[d] that the Ninth Circuit may have a different view of how 'exceeds authorized access' should be construed," as indicated in *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009), a civil proceeding

18

access to TWIG's protected computer to obtain the BWM, such that the motion to dismiss Count Three should be denied.

### C. Definiteness of the Charged Statutes

Finally, Defendants argue that both 18 U.S.C. § 1832 and 18 U.S.C. § 1030 are void for vagueness. As recognized above, Defendants' vagueness challenges must be examined as applied to the facts of this case. At this pretrial stage, the facts have not yet been developed, such that the Court should dismiss Defendants' premature challenge. However, should the Court consider it, Defendants' argument nonetheless fails, based on the facts alleged in the Indictment.

As alleged, Meselhe and Hu each signed a Proprietary Information and Intellectual Property Agreement, acknowledging that proprietary information like the BWM were valuable trade secrets of TWIG, not to be shared with outside individuals, entities or competitors. *Indictment*, ¶ 8. Defendants were uniquely qualified to understand the value of the BWM, as Meselhe was an environmental scientist and civil engineer working with scientists knowledgeable in computer programming, while Hu was a computer scientist with expertise in computer programming and modeling and with access to underlying software codes. *Indictment*, ¶¶ 1, 2, 9. From October 2018 through January 11, 2019, Meselhe and Hu sought to exceed authorized access to TWIG's protected computers, in order to obtain copies

---

under the CFAA. Even so, "the Ninth Circuit's reasoning at least implies that when an employee knows that the purpose for which she is accessing information in a computer is both in violation of an employer's policies and is part of an illegal scheme, it would be 'proper' to conclude that such conduct 'exceeds authorized access' within the meaning of § 1030(a)(2)." *John*, 597 F.3d at 273. The United States submits that the evidence will show that Defendants Meselhe and Hu knew that their actions were both in violation of TWIG's policies and in furtherance of an illegal scheme, such that even under the Ninth Circuit's narrow interpretation, the defendants "exceeded authorized access," in violation of 18 U.S.C. § 1030(a)(2)(C).

of the BWM and related computer inputs, codes, files and post-processing scripts, as contained in TWIG's computer files on the EDF project. *Indictment*, ¶¶ 11-14, 27, 29-31. In furtherance thereof, Meselhe and Hu engaged in surreptitious communications, specifically outlined in the Indictment, designed to avoid detection by TWIG and successfully obtain the protected trade secret, which the defendants clearly could not otherwise obtain. *Indictment*, ¶¶ 19-26.

The Fifth Circuit has cautioned that "the requirement that statutes give fair notice cannot be used as a shield by one who is already bent on serious wrongdoing." *United States v. Brewer*, 835 F.2d 550, 553 (5th Cir. 1987) (quoting *United States v. Griffin*, 589 F.2d 200, 207 (5th Cir. 1979)); *see also United States v. Ragen*, 314 U.S. 513, 524 (1942) (on no construction can the statutory provisions here involved become a trap for those who act in good faith). Here, the charging statutes give fair notice that the defendants actions, as alleged in the Indictment, constitute crimes under 18 U.S.C. § 1832 and 18 U.S.C. § 1030.

## V.    <u>Conclusion</u>

Defendants have failed to show that the Indictment is insufficient or that the charging statutes are unconstitutionally vague as applied to these defendants. Each count in the Indictment tracks the language of the statute charged, clearly alleges the elements of the offense charged, and includes detailed facts to sufficiently notify the defendants as to the crime of which they have been accused. Accordingly, the motion to dismiss lacks merit and should be denied in its entirety without need for a hearing.

UNITED STATES OF AMERICA, by

BRANDON J. FREMIN
UNITED STATES ATTORNEY


/s/ Brian K. Frazier
Brian K. Frazier, TNBN 016691
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana  70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: brian.frazier@usdoj.gov


/s/ Caroline B. Gardner
Caroline B. Gardner, LBN 33842
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana  70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: caroline.gardner@usdoj.gov

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA       :
                                       :

*versus*                                 :        CRIMINAL NO. 19-61-SDD-EWD
                                       :

EHAB MESELHE and            :
KELIN HU                       :

## CERTIFICATE OF SERVICE

The United States hereby certifies that a true and correct copy of the foregoing United States' Response to Defendant's Motion to Dismiss the Indictment and proposed Order were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Michael W. Magner and Steven J. Moore via the court's electronic filing system.

Baton Rouge, Louisiana this 9th day of July, 2019.

/s/ Brian K. Frazier
Brian K. Frazier
Assistant United States Attorney

/s/ Caroline B. Gardner
Caroline B. Gardner, LBN 33842
Assistant United States Attorney

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA              :
                                                      :
*versus*                                          :          CRIMINAL NO. 19-61-SDD-EWD
                                                      :
EHAB MESELHE and                        :
KELIN HU                                       :

## PROPOSED ORDER

Considering the Defendants' Motion to Dismiss the Indictment and the United States'

Response thereto:

**IT IS ORDERED** that the Defendants' Motion to Dismiss the Indictment (D.E. 24) is

**DENIED**.

Read and signed this _____ day of July, 2019, Baton Rouge, Louisiana.


                                                    _____
                                                    HONORABLE SHELLY D. DICK
                                                    UNITED STATES DISTRICT COURT
                                                    MIDDLE DISTRICT OF LOUISIANA